ROBERT J. ROSATI, State Bar No. 112006
robert@erisalg.com
THORNTON DAVIDSON, State Bar No. 166487
thornton@erisalg.com
ERISA Law Group LLP
6485 N. Palm Ave.,
Fresno, California 93704
Telephone: 559-478-4119
Facsimile: 559-478-5939

Attorneys for Plaintiff,
TIMOTHY BOCCIA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

|  |  |
|---|---|
| TIMOTHY BOCCIA,<br><br>    Plaintiff,<br><br>v.<br><br>VISA INC. AND COMPANY AFFILIATES WELFARE BENEFIT AND CAFETERIA PLAN; METROPOLITAN LIFE INSURANCE COMPANY,<br><br>    Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff, TIMOTHY BOCCIA ("Plaintiff" or "Boccia") alleges as follows:

## JURISDICTION

1. Plaintiff's claim for relief arises under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. section 1132(a)(1).  Pursuant to 29 U.S.C. section 1331, this court has jurisdiction over this action because this action arises under the laws of the United States of America.  29 U.S.C. section 1132(e)(1) provides for federal district court jurisdiction of this action.

///

///

## VENUE

2.     Venue is proper in the Northern District of California because: (1) Defendant Visa Inc. And Company Affiliates Welfare Benefits and Cafeteria Plan (The Plan) is administered in Foster City, San Mateo County; and (2) the plan administrator and plan sponsor of Defendant, The Plan, is a California corporation with its principal place of business in the City of Foster City, San Mateo County, California, and thus defendant The Plan resides there.  Defendant Metropolitan Life Insurance Company also may be found there.  Therefore, 29 U.S.C. section 1132(e)(2) provides for venue in this Court.  Intradistrict venue is proper in this Court's San Francisco Division.

## PARTIES

3.     Plaintiff is, and at all times relevant hereto was, a participant, as that term is defined by 29 U.S.C. section 1000(7), of The Plan and thereby entitled to receive benefits therefrom.  Plaintiff was a participant because he was an employee of a company for which employees' benefits The Plan was established to provide certain benefits, including but not limited to long term disability benefits, to certain employees, including Plaintiff.

4.     Defendant, Metropolitan Life Insurance Company ("MetLife") issued Group Policy No. 93851-6 ("The Policy") to Visa Inc. and Company Affiliates.  MetLife thereby provided only the long term disability ("LTD") benefits at issue in this action, wholly insured the LTD benefits due under The Plan, served as claims administrator for LTD benefits of The Plan, made all relevant decisions, and exercised authority for determining eligibility for LTD  benefits under The Policy and for interpretation of terms of The Policy, is obligated to provide the LTD benefits sought in this action, and made the decisions to deny Plaintiff's claim for LTD benefits and to deny his administrative appeal.

5.     The Plan is an employee welfare benefit plan organized and operating under the provisions of ERISA, 29, U.S.C. section 1001 *et seq*.

///

///

///

**CLAIM FOR RELIEF**

6.    The Policy provides long-term disability benefits after an elimination period of 180 days.  For a person under the age of 60 at the time the disability occurred, as was Plaintiff herein, such benefits potentially could continue until Plaintiff reaches the age of 65.

7.    The Policy includes the following terms:

A.    Disability or disabled means that as a result of sickness or injury you are either totally disabled or partially disabled.

B.    Total disability or totally disabled means

"During the Elimination Period and the next 24 months, you are unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue you Usual Occupation in the usual and customary way."

"After such period, you are not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your:

* age;

* education;

* training;

* experience;

* station in life; and

that exists within your physical and functional capacity within the following locations:

* a reasonable distance or travel time from you residence in light of the commuting practices of your community;

* a distance of travel time equivalent to the distance or time traveled to work before becoming disabled; or

* the regional labor market, if you reside or resided

prior to becoming disabled in a metropolitan area."

C.    Substantial and material acts defined as:

"the important tasks, functions and operations generally required by employers from those engaged in your Usual Occupation that cannot reasonably be omitted or modified.  In determining what substantial and material acts are necessary to pursue your Usual Occupation, we will first look at the specific duties required by your job. If You are unable to perform one or more of these duties with reasonable continuity, We will then determine whether those duties are customarily required of other employees engaged in you Usual Occupation, then we will not consider those duties in determining what substantial and material acts are necessary to pursue your Usual Occupation."

D.    Usual Occupation is defined as:

"Any employment, business, trade or profession and the Substantial and Material acts of the occupation you were regularly performing for the Employer when the Disability began.  Usual Occupation is not necessarily limited to the specific job that you performed for the employer."

E.    "Regular Care of a Doctor" means:

You must be under the Regular Care of a Doctor unless Regular Care:

1.    will not improve the condition(s) causing your Disability; or

2.    will not prevent a worsening of the condition(s) causing your Disability.

F.    Regular care means:

1.    You personally visit a Doctor(s) as frequently as is medically required to effectively manage and treat the condition(s) causing your Disability; and

2.    You are receiving appropriate treatment and care which conforms with

1         generally accepted medical standards for the condition(s) causing your

2         Disability.

3         Prior to the initial payment of benefits, provided you are receiving appropriate treatment

4   and care which conforms with generally accepted medical standards for the condition(s) causing

5   your Disability, if the time period between your visits to a Doctor(s) is reasonable.  You will be

6   deemed to have satisfied the Regular Care of a Doctor requirements, even if this results in a visit

7   to a Doctor(s) occurring after the end of the Elimination Period."

8         8.    The definition of disabled as set forth in the Policy has a well established legal

9   meaning pursuant to California law.  California law requires an insurance company to consider:

10   (a) whether the claimant could reasonably be expected to work; recognizing the fact that the

11   insured may do some work or even the fact that he or she may be physically able to do so is not

12   conclusive evidence that his or her disability is not total, if reasonable care and prudence require

13   that he or she desist; (b) given the claimant's physical and/or mental capacity; (c) and his or her

14   station in life; (d) to perform the "substantial and material" duties of his or her own occupation;

15   (e) with "reasonable continuity"; and (f) in the usual and customary way.  Recovery is not

16   precluded because the claimant is able to perform sporadic tasks or attend to simple,

17   inconsequential details incident to the conduct of business.  When evaluating a claimant's

18   capacity to perform "any occupation" the insurance company must take into account the

19   claimant's age, education, experience, training, and station in life.  Thus, an uneducated laborer

20   cannot be expected to become an accountant or banker and a doctor, lawyer, or business

21   executive is totally disabled even if he could run a news stand or work as a day laborer.

22         9.    Plaintiff was employed by Visa Inc. as a Senior Director, ATM Consumer

23   Products and Platforms at the time he became disabled by several co-morbid conditions including

24   toxic sensory neuropathy and peripheral neuropathy and consequential pain, functional

25   incapacity, fatigue, and diarrhea as a result of his medical conditions, his medications, or a

26   combination of the medical conditions and the medications.

27         10.    Boccia became disabled on October 7, 2013 and timely applied for LTD benefits

28   MetLife through the Plan.

1      11.     MetLife personnel instructed Boccia that under the terms of The Plan he was

2  required to apply for Social Security Disability Insurance benefits ("SSDI") through the Social

3  Security Administration ("SSA").  Boccia did so and by notice dated February 15, 2014 the SSA

4  notified Boccia that he had been awarded SSDI benefits beginning April 2014 because the SSA

5  found that he became disabled under its rules on October 7, 2013.  Boccia promptly notified

6  MetLife of that decision.

7      12.     By letter dated March 12, 2014 MetLife denied Boccia's claim for LTD benefits.

8  The denial letter quoted Policy provisions, and concluded that Boccia did not qualify for LTD

9  benefits effective April 5, 2014, the first day for which Boccia way eligible for benefits as a

10  result of the elimination period in The Policy.  The letter did not cite or refer to Boccia's award

11  of SSDI benefits.  The letter claimed that "the clinical evidence received does not support a

12  severity of symptoms or lack of functionality that would prevent you from performing your work

13  duties."  The letter invited Boccia to appeal.

14      13.     By letter dated August 5, 2014, through counsel, Boccia timely appealed the

15  denial of his claim for LTD benefits.  The appeal consisted of a 123 page letter from Boccia's

16  counsel, Boccia's sworn declaration, updated medical records regarding Boccia's treatment, and

17  additional documents in support of the appeal.

18              A.     The letter from Boccia's counsel: summarized the relevant Policy terms,

19                     explained Boccia's medical conditions, summarized Boccia's functional

20                     status, demonstrated that MetLife had predetermined not to grant Boccia's

21                     LTD benefits and withheld pertinent documents from his attorneys; and

22                     summarized Boccia's medical records, and his medications, his doctors'

23                     reports.  The letter also explained that: MetLife failed to reasonably

24                     consider pain, fatigue, the side effects of medications, or mental clouding

25                     disabling conditions and failed to perform a whole person evaluation;

26                     failed to address Boccia's treating doctors' opinions or evaluate the SSDI

27                     award and that MetLife is judicially estopped to deny that Boccia is

28                     disabled by virtue of the SSDI award.  The letter further explained that

MetLife failed to properly evaluate the duties of Boccia's own occupation, that it based its decision on factually unsupported nurses' reviews, that it failed to have Boccia examined, that its review and appeal processes are unfair, and that it made its decision based on an improper consideration of only "objective" medical evidence not required by The Policy and in fact reflecting improper and unfair claims practices by MetLife.  The letter concluded that the denial of Boccia's LTD benefits was contrary to the evidence, that Boccia is disabled under the terms of The Policy and entitled to benefits and that issues not controverted from the letter would be admitted by MetLife and any future litigation.

B.      Boccia's sworn declaration explained that: he suffers from constant severe pain in his calves and feet and suffers from night sweats and night terrors, suffers from fatigue and diarrhea and insomnia due to pain and medication side effects, and has difficulty standing, sitting, and breathing; and he suffers from forgetfulness.  The declaration also explained his medications and their side effects and described Boccia's typical day: how pain impacts his capacity to do activities of daily living; how he is sleep deprived; what his own occupation entailed and why he can no longer perform it.

14.      In response to Boccia's appeal MetLife obtained a peer review report through MES Solutions from Dr. John L. Brusch, M.D., dated November 3, 2014, initially with an addendum dated November 7, 2014.  Dr. Brusch concluded that the medical information did not support functional limitations due to a physical condition or combination of physical conditions and that in his opinion Boccia was not personally a visiting a physician as frequently as medically required to effective manage and treat his conditions and implied that Boccia was not receiving appropriate treatment and care; and that based on his review of the records there was not clinical evidence to support restrictions or limitations and/or side effects resulting from Boccia's medications.

15.      By letter dated November 14, 2014 MetLife invited Boccia and some of his

physicians to comment on Dr. Brusch's report.

    A.    By letter dated November 16, 2014 one of Boccia's physicians responded as follows:

    1.    "It should be apparent from what follows that I disagree with Dr. Brusch's report and conclusions and that in my judgment  Boccia is permanently disabled by his neurological condition."

    2.    "[Mr. Boccia's] disability has two components: the symptom of pain and the neurological deficits of sensory loss and gait ataxia.  The ataxia in turn has 2 components: the sensory loss (producing sensory ataxia) and the antalgic component due to the pain which contributes to the imbalance.  The polyeneuropathy itself has been fixed for years, during which time I have followed him.  What has varies is the degree of pain.  This progressed in 2012 and in addition has varied depending on its response to treatment.  The pain was transiently well controlled by nortriptyline but only at a dose that sedated him, so I then worked on titrating the dose in small increments to try to achieve adequate pain control at a dose that did not sedate him.  This has not yet been achieved.  Your phrase 'the deterioration of the peripheral neuropathy seems to have reversed itself' does not apply here.  The neuropathy is the same as always.  The pain level varies depending on how well the treatment is working and a number of other factors."

    3.    "[Boccia] did not receive physical therapy before I saw him, and I did not order it while treating him.  This is because physical therapy is irrelevant to this problem and would not be expected to help.  The neuropathy and ataxia are permanent.  The only way to improve the ataxia is to manage his pain and its contribution to it."

    4.    As to a question as to why no other medications have been tried, Boccia's physician responded, in part: "They have been.  Before I saw him he received a trial of gabapentin lasting several years.  It did not work.  He also had a trial of topiramate, but this was discontinued due to side effects.  If adjustment to the amount of the current nortriptyline fails adequately to manage his pain, then I will give him trials of other pain modulating medications. . . . In fact, my plan to treat him with Lyrica is mentioned in my notes."

    5.    Dr. Brusch asked this physician to reconcile the fact that  Boccia drives while

"claiming severe" peripheral neuropathy of his legs and feet.  Boccia's physician responded, in part:

> "I see no conflict requiring reconciliation.  Almost all of my
> patients with sensory neuropathies and various types of pain
> syndromes are able to drive safely. . . .  It depends on the individual
> factors such as severity and which sensory modalities are involved.
> In  Boccia's case, he is able to feel the pedals adequately and has
> no weakness of the legs, so there is no problem with his driving."

6.     Boccia's physician responded to a question regarding nerve conduction studies as follows:

> "I did not obtain an EMG and nerve conduction study during his
> course of treatment with me, nor does he recall having had them in
> the past.  From this I conclude that he did not, since this is a
> prolonged and painful test involving dozens of needle sticks in
> various muscles and stimulation of nerves over a period of an hour.
> . . . Secondly, he does not need this test.  There is no question
> from his examinations by me and prior neurologists that he has a
> neuropathy, and there is no uncertainty about the cause.  Therefore
> this study would add nothing to his diagnosis, treatment or
> assessment of disability.  This is why he has never had it."

7.     Dr. Brusch finally asked if this physician considered  Boccia's sexual activity as inconsistent with severe lower extremity peripheral neuropathy.  This physician answered the question as follows:

> "Absolutely not.  Given the strong sexual drive in most humans
> were not comatose (*sic*), those with neuropathies or any type of
> pain syndrome regularly engage in sexual activity.  At times such
> activity needs to be modified, but I have never met a patient in
> whom a neuropathy eliminates all sexual activity."

8.     Boccia's physician concluded that:

\*     He was in agreement with Boccia's medical decisions;

\*     Dr. Brusch's opinion regarding EMGs or MRIs made "no sense."  None of them would reveal why there was an exacerbation of pain;

\*     While a neuropathy is not expected to progress, "the degree of pain from such a neuropathy frequently varies."

\*     In his judgment Boccia is disabled is based partly on his subjective report of pain, "since this is always the case with pain, and pain alone can obviously produce disability and be a justification for disability payments.  However, in this case there are also objective signs of dysfunction in the form of a sensory ataxia and an antalgic gait from the pain associated with recurrent falls."

\*     Pain in neuropathy often gets worse for a variety of reasons or for no identifiable reason.

\*     "Quite an aside from Dr. Brusch's assumption that all sexual activity must involve use of the lower extremities, which many would dispute, the fact that Boccia has a painful neuropathy does not in the least rule out a capacity for sexual activity, although this may in some cases have to be modified."

\*     "When a patient temporarily puts up with side effects, for one reason or another, this does not indicate that they are not side effects."

B.     The other physician to whom Dr. Brusch's inquiries were sent responded by letter dated November 17, 2014 explaining:

"I specifically take exception to the summary of a telephone conversation between Dr. Brusch and myself on 10/26/2014 . . . I specifically said to Dr. Brusch that I reiterated the significant impact on the patient's life regarding his peripheral neuropathy and the association with extreme fatigue when he works."  The doctor included his contemporaneous notes of the conversation.

C.     Boccia, through counsel responded by submitting a 32-page letter dated

November 19, 2014 explaining:

1.      MES Solutions provides flawed deceptive and untrustworthy reports;
        which reports are reviewed and corrected by an MES registered nurse
        internally before being released;

2.      Dr. John Brusch is a dishonest, fraudulent, unethical doctor whose
        opinions are not credible and whose peer review report is unreliable and
        clearly wrong, explaining in pertinent part that Dr. Brusch had provided
        opinions as to nine other clients which show a pattern of unfair and
        medically unsubstantiated reviews, that his opinions regarding Boccia,
        were factually unsupported medically unjustified, inherently dishonest,
        unethical and fraudulent."  The letter also asserted that "No responsible
        fiduciary would rely on [Dr. Brusch's report on Boccia] - - or any other - -
        report from Dr. Brusch," that MetLife asked Dr. Brusch the wrong
        questions and that Dr. Brusch relied upon standards not set forth in the
        Policy.  The letter also provided a number of questions for review by Dr.
        Brusch or some other doctor.

16.     In response to the responses summarized in Paragraph 15, MetLife did the
following:

A.      On December 24, 2014 MetLife referred the responses of Boccia's two doctors - -
        the letters of November 16, 2014 and November 17, 2014 - - and Boccia's
        attorney's letter of November 19, 2014 to Dr. Brusch for an addendum.

B.      Dr. Brusch provided an addendum dated January 2, 2015 in which he:
        (i) wrote "the additional information does not change my prior opinion";
        (ii)     responded to Boccia's first doctor's comments;
        (iii)    reasoned, in part, "there is no objective evidence supporting the claimant's
                 symptoms . . ."
        (iv)     refused to reply to Boccia's counsel's criticisms asserting "These ad
                 hominem retorts of the attorney do not provide any objective data to

1                                support his client's claim of 'disability.'"

2      C.        Since Dr. Brusch did not respond to Boccia's second doctor's comments, on

3                        January 14, 2015 MetLife requested an additional addendum on that issue.

4      D.        By report dated January 15, 2015 Dr. Brusch responded:

5                  (1)      the additional information "did not change my prior opinion."

6                  (2)      the doctor "did not provide any objective proof of a significant neuropathy

7                              such as nerve conduction tests or formal neurological examination."

8      E.        MetLife then asked Dr. Brusch to address questions raised in its <u>initial</u> referral to

9                  him regarding: (i) Boccia's attorney's August 5, 2014 appeal letter; (ii) Boccia's

10                 declaration, (iii) Boccia's updated medical records submitted with his appeal; (iv)

11                 Boccia's SSA file and the medical records in that file.  Dr. Brusch responded by

12                 addendum to his November 3/7, 2014 report that he did and "There is no change

13                 to my prior opinion . . ."

14      F.        According to MetLife's claims notes, no other activity or investigation was

15                 conducted on Boccia's claim from the submission of Boccia's doctors' and

16                 attorney's responses to Dr. Brusch's November 3/7, 2014 report until March 16,

17                 2015, when a decision was made to deny Boccia's appeal.

18     17.      By letter dated March 6, 2015 MetLife denied Boccia's appeal.  The letter quoted

19 Policy provisions, summarized Dr. Brusch's opinions, purported to distinguish the SSDI award,

20 and concluded that Boccia did not meet the Policy's definition of disability and that therefore the

21 decision to deny LTD benefits was appropriate.  Under the terms of The Plan documents upon

22 receiving notice of MetLife's final adverse benefit determination dated March 6, 2015, Boccia's

23 employment by Visa would automatically end and all of his employment-related benefits would

24 also end unless Boccia obtained a position with Visa within 30 days.  Boccia is totally disabled

25 and thus did not obtain a position with Visa within 30 days of MetLife's March 6, 2015 letter.

26 Consequently The Plan terminated other benefits which Boccia received, or was entitled to

27 including but not limited to: (1) medical, dental and vision insurance for Boccia at Visa's sole

28 expense; (2) spousal medical dental and vision insurance paid for by Boccia; (3) eligibility for

and participation in an employee option program; (4) life insurance for Boccia; (5) spousal life insurance and (6) other benefits, all jointly referred to herein as "Collateral Plan Benefits."

18.    Plaintiff has exhausted all administrative remedies required to be exhausted by the terms of the Plan and by ERISA.

19.    At all times mentioned herein Plaintiff was, and continues to be, totally disabled under The Policy's definition of totally disabled and not subject to any benefits limitation and therefore entitled to LTD benefits under The terms of The Policy.

20.    Defendants are judicially estopped to argue that Plaintiff is not totally disabled under the terms of The Policy:

        A.    The Policy specifies that monthly LTD benefits will be reduced by other income benefits, including SSA benefits.

        B.    MetLife can reduce Boccia's LTD benefits by $2595 per month due to his receipt of SSDI benefits.

        C.    Boccia was awarded SSDI benefits after arguing and establishing that he was incapable of performing his own or any job in the national economy and therefore entitled to SSDI benefits.

        D.    The Social Security Administration necessarily determined that Boccia was incapable of performing not only his own occupation but any occupation in the national economy.  Under the Social Security Act, a person qualifies as disabled and thereby eligible for benefits only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his pervious work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).  Disability under the Social Security Act means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months . . ."  42 U.S.C. §

423(d)(1)(A).

E.    MetLife and The Plan were in privity with Plaintiff in the SSA
      proceedings and therefore, with Boccia, asserted therein that Boccia could
      not perform his own occupation or any occupation in the national
      economy, considering his age, education, and work experience and
      prevailed on those arguments.

F.    By virtue of these facts Boccia acted in a trustee-like capacity for MetLife
      and The Plan in obtaining the proportion of his SSDI awards which
      reduces his LTD benefits; MetLife, The Plan and Plaintiff successfully
      argued to the SSA that he was incapable of performing any occupation in
      the national economy.

G.    MetLife and The Plan are therefore judicially estopped to make the
      opposite argument in this action; that is, to argue that given his age,
      education and experience Boccia is capable of performing his own or any
      occupation in the national economy.

21.    MetLife and The Plan were required to provide Plaintiff a full and fair review of
his claims for benefits pursuant to 29 U.S.C. § 1133 and its implementing Regulations.
Specifically:

A.    29 U.S.C. § 1133 mandates that, in accordance with the Regulations of the
      Secretary of Labor, every employee benefit plan, including defendants
      herein, shall provide adequate notice in writing to any participant or
      beneficiary whose claim for benefits under the plan has been denied,
      setting forth the specific reasons for such denial, written in a manner
      calculated to be understood by the participant and afforded a reasonable
      opportunity to any participant whose claim for benefits has been denied a
      full and fair review by an appropriate named fiduciary of the decision
      denying the claim.

COMPLAINT
14 of 22

B.     The Secretary of Labor has adopted Regulations to implement the requirements of 29 U.S.C. § 1133.  These Regulations are set forth in 29 C.F.R. § 2560.503-1 and provide, as relevant here, that employee benefit plans, including Defendant, shall establish and maintain reasonable procedures governing the filing of benefit claims, notifications of benefit determinations, and appeal of adverse benefit determinations and that such procedures shall be deemed reasonable only if:

i.     Such procedures comply with the specifications of the Regulations.

ii.    The claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, the Plan provisions have been applied consistently with respect to similarly situated claimants.

iii.   Written notice is given regarding an adverse determination (i.e., denial or termination of benefits) which includes: the specific reason or reasons for the adverse determination; with reference to the specific plan provisions on which the determination is based; a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; a description of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following a denial on review; if an internal rule, guideline, protocol, or similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar

criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

    iv.    Plans are required to provide a full and fair review of any adverse determination which includes:

        a.    That a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.

        b.    A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information: (1) was relied upon in making the benefit determination; (2) was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; (3) demonstrates compliance with the administrative processes and safeguards required pursuant to the Regulations in making the benefit determination; or (4) constitutes a statement of policy or guidance with respect to the Plan concerning the denied benefit without regard to whether such statement was relied upon in making the benefit determination.

        c.    The Regulations further provide that for a review that takes into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination;

d.  The Regulations further provide that, in deciding an appeal of any adverse determination that is based in whole or in part on a medical judgment that the appropriate named fiduciary shall consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

e.  The Regulations further require a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the Plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal nor the subordinate of such individual.

f.  The Regulations further provide that a healthcare professional engaged for the purposes of a consultation for an appeal of an adverse determination shall be an individual who is neither the individual who was consulted in connection adverse benefit determination which was the subject of the appeal nor the subordinate of any such individual.

22.  MetLife and The Plan denied Plaintiff a full and fair review of his claim for benefits as follows:

A.  MetLife and The Plan do not have claims procedures which contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, the Plan provisions have been applied consistently with respect to similarly situated claimants.

B.  MetLife, when terminating Plaintiff's claim for LTD benefits did not provide a description of the additional material or information necessary

1   for Plaintiff to perfect his claim or an explanation of why such material or

2   information was necessary.

3   C.   MetLife did not consider the comments and documents submitted in

4        support of Plaintiff's appeal.

5   D.   MetLife and The Plan do not have standards or criterion to ensure that

6        plan provisions are consistently applied.  Instead plan provisions are given

7        no consistent meaning or application but instead are construed and applied

8        on a case-to-case basis in a manner intended to deny claims for benefits

9        and to present claimants with a "moving target" as to how to comply with

10       plan requirements.

11  E.   MetLife failed and refused to provide all relevant documents to Plaintiff

12       for use in his appeal and withheld relevant documents from Plaintiff after

13       the denial of his appeal.

14  F.   MetLife did not fairly, reasonably or accurately evaluate Plaintiff's

15       medical conditions because it did not consider the global, whole-person

16       nature of Plaintiff's health concerns or examine the overall state of his

17       health, but instead instructed its reviewing doctor to evaluate discrete

18       issues in isolation and then MetLife and The Plan disregarded the

19       compounding effects of Plaintiff's co-morbid conditions.

20  G.   MetLife evaluated Plaintiff's claim, in full or in part, based on a claimed

21       absence of "objective evidence" and by disregarding and discounting

22       "subjective evidence" or "self-reports", such as pain and fatigue, even

23       though The Policy does not require objective evidence or preclude

24       consideration of subjective evidence.

25  H.   Plaintiff requested that MetLife provide him with copies of all documents,

26       records, or other information relevant to his claim, as that term is defined

27       by ERISA regulations.  MetLife failed and refused to provide him with all

28       such documents records and other information.

I.  MetLife failed and refused to take into account subjective evidence and Plaintiff's self-reports, even though nothing in The Policy limits proof of disability to objective evidence or precludes reliance on self-reports or subjective evidence to prove disability.

J.  MetLife instructs the doctors whom it hires to review claimants' files and records to change their reports.

K.  MetLife solicits false evidence and/or condones the presentation of false evidence and did so here with reference to the report and addendums by Dr. Brusch.

L.  As a matter of common practice, MetLife either fails to obtain all relevant evidence or selectively provides evidence to its other reviewing doctors. Thus the doctors conducting the reviews are basing their opinions on incomplete evidence.

M.  MetLife obtained its review reports from MES Solutions which provided MetLife Dr. John L. Brusch. MetLife knew in advance of utilizing Dr. Brush's services regarding Boccia's claim that Dr. Brusch was dishonest and recurrently provided medically unsound opinions, but used his services to evaluate Boccia's claim because it wanted a dishonest and medically unsound report and opinions.

N.  Defendants MetLife and The Plan have otherwise violated the Regulations.

23. Review of this claim should be de novo because:

A.  Plaintiff is informed and believes and thereon alleges that the Policy does not reserve discretion to MetLife. Plaintiff so alleges because the Certificate of Insurance does not retain discretion, but which is only specified in a document after the end of the Certificate of Insurance in a document entitled "additional information." Plaintiff is informed and believes that had discretion been reserved in the Policy it would have so

stated in the Certificate of Insurance.  Plaintiff is also informed and believes and thereon alleges that the Policy can only be amended in writing by a document signed by MetLife and Visa and that the purported reservation of discretion in the "additional information" was not adopted pursuant to such an amendment and therefore is void and invalid.

24.    Alternatively, if for any reason the Court concludes review is for abuse of discretion, this Court should review MetLife's decision with limited deference because:

       A.    MetLife has a conflict of interest.

       B.    MetLife's decisions were motivated by its financial self-interest.

       C.    MetLife failed to comply with ERISA's procedural requirements regarding benefit claims procedures and full and fair review of benefit claim denials as set forth in Paragraphs 21 and 22.

       D.    MetLife utilized a medical expert to review Plaintiff's medical records who had a financial conflict of interest, and therefore did not provide a neutral, independent review process.

       E.    MetLife solicited false evidence and relied upon from Dr. Brusch.

       F.    MetLife knowingly utilized false evidence - - the report and addendum of Dr. Brusch - - to support its appeal denial decision.

25.    Defendants' denial of Plaintiff's LTD  benefits was arbitrary and capricious, an abuse of discretion, and a violation of the terms of The Policy.

26.    An actual controversy has arisen and now exists between Plaintiff and Defendants with respect to whether Plaintiff is entitled to LTD benefits under The Policy.

27.    Plaintiff contends, and Defendants dispute, that Plaintiff is entitled to LTD benefits under the terms of The Policy because Plaintiff contends, and Defendants dispute, that Plaintiff is totally disabled.

28.    Plaintiff desires a judicial determination of his rights and a declaration as to which party's contention is correct, together with a declaration that Defendants are obligated to pay

long-term disability benefits, under the terms of The Policy, retroactive to the first day his benefits were denial, until and unless such time that Plaintiff is no longer eligible for such benefits under the terms of The Policy.

29.     A judicial determination of these issues is necessary and appropriate at this time under the circumstances described herein in order that the parties may ascertain their respective rights and duties, avoid a multiplicity of actions between the parties and their privities, and promote judicial efficiency.

30.     As a proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff was required to obtain the services of counsel to obtain the benefits to which he is entitled under the terms of the Plan.  Pursuant to 29 U.S.C. section 1132(g)(1), Plaintiff requests an award of attorney's fees and expenses as compensation for costs and legal fees incurred to pursue Plaintiff's rights.

WHEREFORE, Plaintiff prays judgment as follows:

1.     For declaratory judgment against Defendants, requiring Defendant MetLife to pay long-term disability benefits under the terms of The Plan to Plaintiff from April 5, 2014 for the period to which he is entitled to such benefits, with prejudgment interest on all unpaid benefits, until Plaintiff attains the age of 65 years or until it is determined that Plaintiff is no longer eligible for benefits under the terms of The Policy.

2.     For declaratory judgment against Defendant, The Plan, requiring The Plan to reinstate "Collateral Plan Benefits" under the terms of The Plan for the period to which Plaintiff is entitled to such benefits, until it is determined that Plaintiff is no longer eligible for such benefits under the terms of The Plan.

3.     For attorney's fees pursuant to statute against defendants.

4.     For costs of suit incurred.

5.     For such other and further relief as the Court deems just and proper.

Date:   April 7, 2015            ERISA LAW GROUP LLP

By: */s/ Robert J. Rosati*
ROBERT J. ROSATI

Attorneys for Plaintiff,
TIMOTHY BOCCIA